KELLEY ISLAND LIME & TRANSPORT CO. v. CITY OF CLEVELAND et al.

(District Court, N. D. Ohio, E. D. February 6, 1906.)

No. 2,321.

1. ADMIRALTY—PLEADING—VARIANCE.

Where the libel in a suit to recover for injury to a vessel alleged to have been caused by the improper navigation of another vessel correctly states the essential facts by reason of which the injury occurred, a failure to give the proper interpretation of such facts, or the correct scientific reason for the result, will not constitute a material variance between the allegations and proof; and, even if so considered, an amendment will be permitted where the case has been tried on the theory stated in the libel.

2. SHIPPING—INJURY OF VESSEL ON BRIDGE PIER—VIOLATION OF RULES BY OVERTAKING VESSEL.

The Ohio, a flat-bottomed steam scow, when a short distance from the open draw of a bridge on the Cuyahoga river was overtaken and passed by the large tug Lutz without any signal or agreement, the stern of the Lutz passing her bow at about the time it entered the draw where the channel was but 60 feet wide, the effect being to create a current or suction which caused the Ohio to sheer, striking some submerged timbers around the bridge pier by which she was so injured that she sank. Held, that the injury was due to the fault of the Lutz in passing in violation of rule 25 of the rules for navigation on the Great Lakes and their tributary waters (Act Feb. 8, 1895, c. 64, § 1, 28 Stat. 649 [U. S. Comp. St. 1901, p. 2891]), and the inspectors' rules made thereunder, which required her to signal, and not to pass without the consent of the overtaken vessel, and that she was liable for the injury; no want of care or improper navigation being shown on the part of the Ohio.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 344, 345.]

3. NAVIGABLE WATERS—OBSTRUCTION BY BRIDGE PIER—LIABILITY OF CITY.

Where a contractor employed by a city was engaged in rebuilding a drawbridge across a navigable stream, and, in doing the work, had removed the protection piling around the central pier, the city, even if responsible for the acts of the contractor, cannot be held liable for the injury of a vessel by striking against submerged timbering around the pier because of the failure to mark the position of such timbers when their existence was known to the master of the vessel, who tried to avoid them, and the injury was not due to the absence of such marks or signals.

In Admiralty.

Roger M. Lee, for libelant.

Newton D. Baker and Chas. J. Estep, for respondent City of Cleveland.

Goulder, Holding & Masten, for respondents Great Lakes Towing Co.

TAYLER, District Judge. About 3 o'clock on the afternoon of June 25, 1901, the steam scow Ohio, loaded with sand, was passing up the Cuyahoga river, and, in going through the starboard draw of the middle Seneca street bridge, in the city of Cleveland, came into collision with submerged timbers forming a part of the sheathing surrounding the central pier of the draw; and, after proceeding 200 or 300 feet, sank. Her owners filed this libel against the city of Cleveland, charging negligence in respect to the submerged timbers and the condition of the central pier of the bridge, and against the Great Lakes Towing Company, owner of the tugs Goulder and Lutz, charging them with violation of the law in the omission to give signals of their desire to pass the Ohio in the neighborhood of this draw, in consequence of which the Lutz, passing the Ohio on her starboard side, produced a current which caused the Ohio to sheer and run upon the submerged timbers, with the result as stated.

The Goulder was so far distant from the Ohio when the accident occurred that no serious claim is now made that she was responsible in any way for the accident; and there is no testimony which would indicate that she ought to be in any way held on account of it. The question of her responsibility will, therefore, be no further discussed.

The Ohio was a flat-bottomed steam barge, 131 feet long, 29 feet wide, and about 8 feet deep, with straight sides and a V-shaped bow, the turn of the bow commencing about 12 feet abaft her stem. On the occasion of the accident, she was loaded so that her deck was about 8 inches above the water, and she drew 7 or 7½ feet. Her engine room and pilot house were aft, extending about 30 feet forward from her stern; the pilot house being about 12 feet wide and 7 feet high, so located that the front of the pilot house set back 30 inches from the forward end of the engine room roof, leaving a strip of standing room the width of the engine room and 30 inches wide, fore and aft, in front of, and on the level of, the pilot house floor. This space was used by the Ohio's master as the "bridge," when commanding the vessel. The Ohio had two engines, and twin-screw propellers, and was capable of a speed, loaded and in deep water, of about 7½ miles per hour.

The tug Lutz was 84 feet long, 21 feet wide, drew from 7 to 8 feet of water forward and 11 to 11½ feet aft, and was capable of a speed of about 14 miles per hour. She was what would be called, in these waters, a large and very powerful tug.

The middle Seneca Street Bridge, at which this accident occurred, was a drawbridge, owned and operated by the city of Cleveland. Having arranged to construct a new bridge at this point, without any middle pier, it had, a short time before, employed a contractor to remove the central pier. In the progress of this work, the continuous line of protection piling which surrounded the pier, as well as the area covered by the bridge when the draw was open, was removed, and was in that condition when the accident happened. This protection piling ran outside of the stonework of the pier a distance of from five to six feet. The substructure of the stone pier was octagonal in form, and surrounded by heavy timbers,

bolted together, which, being mortised into each other, projected, with overlapping ends, at the several angles of the octagon. It was upon one of these submerged projections that the Ohio probably struck. There was no mark, or cautionary signal, placed in the river to show that the protection piling had been removed, and to indicate the line beyond which it would not be safe to navigate a vessel. The master and crew of the Ohio testified that they knew that the protection piling was out, and that it was necessary to keep well away from the pier in running their vessel through the draw. In order to carry on the work of removing the center pier, and perform the work of construction, the port draw—going up stream—had been closed with a line of piling, so that the only way by which vessels could pass up through the bridge was by way of the starboard draw, the width of which was 60 feet. One hundred and eighty feet below the draw, on the starboard side of the stream, passing up, is a bend in the river, called "Collision Bend," or "the Knuckle," the angle of which is about 70 degrees; so that a vessel passing from below up the river, and intending to go through the starboard draw of the middle Seneca Street Bridge, must necessarily make a turn to starboard of about 10 points, or 110 degrees.

On the afternoon in question, the Ohio, having passed through the lower Seneca Street Bridge, and having been passed by the tug Goulder under circumstances which seem to have had no relation to the accident, proceeded toward "the Knuckle," a few hundred feet up the river, at a speed of about three miles an hour; and then, going forward with her port propeller and backing with her starboard propeller, and porting her wheel, undertook to make the turn around "the Knuckle." Her distance out from the starboard bank, or dock, at this point was from 60 to 100 feet. While she was making this turn, and when her bow was at a somewhat uncertain distance from the open draw of the middle Seneca Street Bridge, but which could not have been more than from 100 to 150 feet, the tug Lutz came up on her starboard side, having given no signal of her desire to pass the Ohio, and with no knowledge on the part of the navigator of the Ohio of the fact that she was coming, until she came into view at a point between the Ohio and the dock immediately abreast of the pilot house, in front of which the captain stood. At this time the Ohio was proceeding at a rate of from one to three miles an hour; the libelant claiming that her speed was something like three miles an hour, and the respondents claiming that her speed was about one mile per hour. The Lutz had drifted—so her crew claimed—part of the way up, after passing through the lower Seneca Street Bridge, and, just as she came alongside the Ohio on the starboard side, the engineer of the Lutz received a signal to go ahead, which she at once did, passing the Ohio at a speed of not less than five miles an hour, and, according to some of the witnesses, at a higher rate of speed.

Exactly where the two vessels were when the Lutz's stern passed the Ohio's bow it is impossible to say, in consequence of the irreconcilable conflict of testimony. We are relegated, in order to arrive at an answer sufficiently satisfactory to determine the merits of this

144 F.—14

case, to the surrounding circumstances, which are reasonably free from doubt. It is apparent that when the Lutz was some distance down the river, and near the lower Seneca Street Bridge, some 400 or 500 feet from the Ohio, the Ohio was undertaking to negotiate the turn. While so doing her bow could not have been more than 200 feet away from the draw. The Lutz came up slowly, and it is fair to presume that she did not proceed with any considerable speed until she had squared herself for the channel of the draw. At the time when she put on speed, it seems to be clear that she was alongside the stern of the Ohio, and, with the Ohio proceeding at sufficient speed to give her steering headway, her bow must have been close to the draw, if not within the draw channel, when the stern of the Lutz passed her. This seems to be the necessary inference from all of the conditions that surrounded the situation, and from such of the testimony as seems to be credible and consistent with the actually existing facts. Whatever was the exact relative position of the two vessels, it is certain that just as the bow of the Ohio came into the draw, with the channel but 60 feet wide, and almost certainly immediately after the Lutz had passed her, she sheered to port, and, at a point about 10 or 12 feet back of the turn of the bow, she struck the submerged timber, scraped along to a point about amidships, and just aft of this point, the timber penetrated the side of the hull and tore a hole some 12 or 15 feet long, as a result of which she went to the bottom.

The libel alleges that the sheering was due to the fact that "when the stern of the Lutz was opposite the starboard bow of the Ohio, the Lutz turned suddenly to starboard, thereby throwing the current of her wheel against the starboard bow of the Ohio, causing the bow of the Ohio to be thrown toward the middle pier of the bridge," in consequence of which she sank.

In paragraph nine of the libel occurs the following language:

"And reserving to itself the right to urge any faults which may appear on full hearing against either or both of said respondents, it here alleges the following specific faults," etc.

The claim is made (which might as well be disposed of now as later), that the allegations of the libel do not conform to the proof. It may be that this is so; but it is sufficient to say, in reply to this: (1) That where the essential facts, by reason of which the injury occurred, are correctly stated, a failure to give a proper interpretation of those facts, and, in a case like this, a failure to give the scientific reason for the result, or the scientific expression of the causal relation between the facts shown and the result following, ought not to be considered as a material disagreement between the facts alleged and the facts proved. If it appear from the proof that the passage of the Lutz close to the Ohio, and through this narrow channel, by any means caused such a disturbance of the water as to bring about the sheering of the Ohio over against the pier, it would seem as if the allegations of the libel were sufficiently definite to permit the proof; and, if otherwise competent for that purpose, to permit a recovery on account of it. (2) Even if what has just been stated was not true

as a proposition of law, the fact that the case has been tried upon the theory that the current produced by the passage of the Lutz through this narrow channel, either by creating a suction which drew to starboard the stern of the Ohio, and thus caused her bow to sheer to port, or the general effect of the waves of displacement, or the piling up of the waves of the Lutz against the mainland dock, and their return action upon the Ohio in that narrow channel, or all combined, would justify the court in permitting an amendment of the libel to conform to the theory of the trial and the facts thus proved.

As I have already indicated, it will be an endeavor, hopeless of producing satisfactory results, to attempt to reconcile the conflicting stories of the crews of the two vessels directly involved in this accident; and we must undertake to try out the reasonableness and credibility of the several statements by the other facts in the case, which seem to be more or less certainly established.

Considering the relative positions of the Ohio, the Goulder and the Lutz when the Goulder passed the Ohio, the position of the Ohio when the Lutz passed through the lower Seneca Street Draw, and the speed with which the Lutz came up from that draw toward "the Knuckle," and the speed at which the Ohio must have been traveling in order to make any headway at all, the presumption that the master of the Ohio, navigating a twin-screw vessel like the Ohio, which would not be difficult to control in undisturbed waters, would be very unlikely to navigate his vessel in such close proximity to the pier when there was ample room for him to pass through the channel, together with the fact that he testified that he knew he must keep out from the pier on account of the removal of the protection piling, and the added presumption that he must have known that that protection piling was out, and the evidence reconcilable with the proved conditions, all lead to the certain conclusion that, at the time that the stern of the Lutz passed the bow of the Ohio, her bow must have been well up into the draw.

Rule 25, embodied in the act of Congress of February 8, 1895, c. 64, § 1, 28 Stat. 649 [U. S. Comp. St. 1901, p. 2891], being the rules controlling the navigation of the Great Lakes and their tributary waters, is as follows:

"In all channels less than 500 feet in width, no steam vessel shall pass another going in the same direction, unless the steam vessel ahead be disabled, or signify her willingness that the steam vessel astern may pass; subject, however, to the other rules applicable to such a situation."

Rule 28, § 3 (28 Stat. 649 [U. S. Comp. St. 1901, p. 2892]), gives the board of supervising inspectors of the United States authority to establish other regulations not inconsistent with the provisions of the statutes, which it provides shall have the force of law. In consequence of this provision of the statute, the following rules applicable to this situation have been adopted, and were, at the time of this accident, in force:

Supervising Inspectors' Rule 6. "When steamers are running in the same direction, and the pilot of a steamer which is astern shall desire to pass on the right or starboard side of the steamer ahead, he shall give one short blast of the whistle, as a signal of such desire and intention, and shall put

his helm aport; or if he shall desire to pass on the left or port side of the steamer ahead, he shall give two short blasts of the whistle as a signal of such desire and intention, and shall put his helm to starboard, and the pilot of the steamer ahead shall answer by the same signals; or, if he does not think it safe for the steamer astern to attempt to pass at that point, he shall immediately signify the same by giving several short and rapid blasts of the whistle; and under no circumstances shall the steamer astern attempt to pass the steamer ahead until such time as they have reached a point where it can be safely done, when said steamer ahead shall signify her willingness by blowing the proper signals. The boat ahead shall in no case attempt to cross the bow or crowd upon the course of the passing steamer."

Rule 22. "Notwithstanding anything contained in these rules, every vessel overtaking any other shall keep out of the way of the overtaken vessel."

Rule 21. "Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

28 Stat. 649 [U. S. Comp. St. 1901, p. 2891].

It is admitted that no signal was given by the Lutz of her intention to pass the Ohio, and that the Ohio did not "signify her willingness" that the Lutz might pass her. If, therefore, the violation by the Lutz of these rules had anything to do with the sheering of the Ohio against these submerged timbers, she must, in the absence of effective excuse, be held liable for the resulting injury and damage. It is not necessary to here and now discuss whether, in such a case as this, which is not one of collision between two vessels, the burden rests upon the Lutz of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; R. &. O. Navigation Co. v. Boston Ins. Co., 136 U. S. 408, 10 Sup. Ct. 934, 34 L. Ed. 398; Belden v. Chase, 150 U. S. 674, 14 Sup. Ct. 264, 37 L. Ed. 1218; The Lansdowne (D. C.) 105 Fed. 436.

For, considering all of the evidence together, it is established to the satisfaction of the court that the passage of the Lutz, at the speed at which she was manifestly traveling, with a draft of 11 or 12 feet at her stern, actually did cause such a disturbance of the water through this narrow channel as resulted in forcing the bow of the Ohio over to port, and against these submerged timbers. All that has been said by experts and the courts as to the effect, by suction or currents, of the passage by one overtaking vessel upon another in an open channel of greater or less width, is emphasized many fold in such conditions as existed at the point of this accident. Here was a channel not more than 60 feet wide, with a dock on the one hand and a pier and shallow water on the other, with a large and powerful tug, her stern sunk almost twice as far below the surface of the water as the stern of the Ohio. If it be true that suction may have such effects as are ascribed to it in an open channel, what may we not say as to the results of such a vessel, moving through such a place as we have here, upon a light-draft, flat-bottomed vessel like the Ohio? Who can say that, even if the Ohio was a hundred feet or more behind the Lutz when the Lutz passed through the draw, the currents set in motion by her passage may not have been powerful enough to force the Ohio from her course when she came within this confined space? The conclusion to which I come, therefore, is that the Lutz passed the Ohio without having complied with the law requiring sig-

nals and the consent of the overtaken vessel, and that it was in consequence of the Lutz passing the Ohio in close proximity to the draw, if not directly within the draw itself, that the sheer took place; and that the Lutz is therefore liable for the damage done to the Ohio.

It remains, now, to determine the relation of the city of Cleveland to this matter of liability, in view of her relation to the pier and the work being done upon it. It is contended by the city that the work of removing the pier had been, by contract, turned over to an independent contractor; that as to the particular means of carrying out this work, the city had no authority over the contractor; that the removal of the protection piles, which it is insisted by both the libelant and the owner of the Lutz was negligent, was done by the contractor, and was not under the control or direction of the city. In the view that I take of the facts in this case, it is not necessary to pass upon this interesting question, as to whether or not the city can relieve itself of liability in such a case as this by turning over to an independent contractor the performance of the work. The removal of these protection piles may have been a concurring cause of the injury, but the accident did not occur because there was no warning there to inform navigators of the river how close they might approach the pier with safety. The Ohio did not strike the hidden beams because her master thought it was safe to go there, but she went there in spite of the master and wheelsman, and when, according to their testimony, they were endeavoring to keep farther out in the channel and away from the pier.

The captain of the Lutz testifies that he was trying to keep out as near the middle of the channel as he possibly could; that he knew the protection piling had been taken out, and he told the pilot, as they were going up stream, to keep away from the center pier as far as possible, as "she had her protection removed." The wheelsman gives the same account of it. Now the libelant has strenuously endeavored to hold the city liable for this accident, and we may assume that this testimony is true, since such bearing as it has is against the contention of the city's liability.

It follows, therefore, from all the testimony in the case, that the accident would have happened, even if the city, or the city's contractor, had maintained some warning signal indicating the point beyond which it was dangerous to go. If that be true, the city could not be at fault in relation to this accident, if, in the work of removing the pier, it removed the protection piles. To say that because, in the progress of the work of repair or reconstruction, it had removed the piles set up to protect vessels and protect the bridge, it could be held liable for a collision between a passing vessel and a portion of the pier, when the collision did not occur in consequence of the failure to warn navigators of the location of the pier, is to say, in effect, that the city did not have the right to remove the protection piles at all, if, in the course of the reconstruction of the bridge, it seemed to become necessary to do so. I therefore hold that the city is not liable.

A decree may be drawn in favor of the libelant, and against the respondent, the Great Lakes Towing Company, with the usual reference to a master to assess damages.