MUNROE et al. v. CITY OF CHICAGO.

(District Court, N. D. Illinois, E. D. February 16, 1911.)

No. 10,346.

NAVIGABLE WATERS (§ 20*)—FAILURE TO OPEN BRIDGE—LIABILITY FOR INJURY TO VESSEL—NEGLIGENT NAVIGATION.

The steamer Markham, going up Chicago river at night, when 800 feet away, signaled for the opening of the jackknife bridge at Taylor street, owned by the city. The bridge was not opened, and the steamer proceeded for 400 or 500 feet at slow speed, signaling twice more, and then stopped and backed; but her momentum and the current carried her against the bridge, and she was injured. The bridge was equipped, as required by the government regulations, with two red lights in the center, one on the end of each opening section, which changed to green lights when the sections and lights were raised. A city ordinance also required

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a signal to be shown on the approach and signaling of a vessel, when for any reason the bridge could not be opened; but such ordinance was not observed. *Held*, that the red lights shown were in effect danger signals, showing that the bridge was closed, that so long as they remained so the steamer was bound to keep under such control that she could be stopped before striking the bridge, and that the injury was due to her negligent navigation, and the city could not be held liable therefor.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 90; Dec. Dig. § 20.*]

In Admiralty. Suit by William Munroe and others, as owners of the steamer Markham, against the City of Chicago. Decree for respondent.

C. E. Kremer, for libelants.

Edward J. Brundage, Corp. Counsel, and Charles M. Haft, Asst. Corp. Counsel, for respondent.

CARPENTER, District Judge. On October 19, 1909, the steamer Markham was bound up the Chicago river, and while opposite Polk street signaled for the Taylor street bridge. The first signal was given when about 800 feet from the bridge. The Markham was proceeding under slow check, as slow, in fact, as it was possible for her to go and maintain steerage. It was about 5 o'clock in the morning. The atmosphere was clear, and the captain could see the two red lights in the center of the bridge. This bridge was of the jackknife or bascule variety, and was equipped with the lights prescribed by the Lighthouse Board under the direction of the Department of Commerce and Labor, namely: There were placed on each leaf, near the point where they touched, and on the upstream and downstream sides, a square lantern swinging behind a frame containing a circular panel of red and green colored glass, with the result that when the bridge was closed there would be shown on the upstream and downstream sides two red lights close together in the center of the bridge, and when completely open two green lights at an elevation on each side of the opening. There were also stationary red lights at the lower side of each leaf, showing the width of the channel. The lights in the center of the bridge flashed red when the bridge was down, and green when the bridge was open. On the morning of the accident the bridge was down, with the two red lights in the center showing, indicating that the bridge was closed.

When the Markham had proceeded 200 or 250 feet, after her first signal, her master signaled again for the bridge to open. The bridge was not opened, nor was any bell rung (indicating to those on the street that the bridge was opening, or about to be opened), nor was any other signal given which could have led the master of the vessel to believe that the bridge was to be opened. The steamer then proceeded about 200 feet further downstream, when she signaled a third time and stopped her engines. The current was carrying the boat towards the bridge at about three miles an hour, and the captain, at this point realizing that the bridge was not going to open, backed the steamer. The momentum of the boat, however, carried it against the bridge, and a damage resulted, it is claimed, of $1,000. The pilot house was taken off, and one of the spars broken.

The answer of the city sets up the following ordinances of the city of Chicago, which were admitted to be in force at the time of the accident:

"992. Vessel Signals.—The commissioner of public works is hereby required to provide and maintain at the several bridges over the Chicago river and its branches and the Calumet river, in the best and most practicable manner, vessel signals as required by this article.

"993. Signals Prescribed.—Each signal shall be a ball of suitable material of red color for use in the daytime, and shall be not less than twenty-four inches in diameter. The signal for the nighttime shall be a red lantern of such size and so placed and arranged, when elevated, as to be easily seen up and down the river and the street. Such signals shall be elevated when upon the approach of any vessel, such vessel having signaled for the bridge, the bridge tender for any reason cannot open such bridge, and the same shall remain elevated until the bridge can be opened: Provided, also, that after any bridge has been open for the purpose of permitting vessels to pass through, the proper signal shall be elevated before the bridge is closed and be kept elevated for fully ten minutes for such persons, teams, or vehicles as may be in waiting to pass over, if so much time shall be required when such signals shall be lowered. At all other times such signals shall remain lowered.

"994. Duty of Vessels—Penalty.—It shall be unlawful for the owner, officer, or other person in charge of any vessel in transit upon the Chicago river and its branches or the Calumet river or any part thereof, to attempt to navigate any such vessel past any of the bridges over said river or branches while said signals are elevated, or while the said bridges or any of them may be opening or closing. Any person who shall violate any provision of this section shall be fined not less than ten dollars nor more than fifty dollars for each offense."

It is claimed by the libelant that it was the duty of the city to open the bridge upon proper signal being given by the vessel; that a bridge is an obstruction to navigation, and must be operated with a minimum of inconvenience as to vessels; that the right of navigation is paramount to all other rights. It is also claimed that under the city ordinance it was the duty of the city to have given some signal, advising the vessel that the bridge was not going to open, and that such signal must be given in time to permit the vessel to guard against striking the bridge.

Great reliance is placed by libelant upon the case of Clement v. Metropolitan West Side El. Ry. Co., 123 Fed. 271, 59 C. C. A. 289, decided by the Court of Appeals in this Circuit in 1903. In that case the steamer Prince, proceeding south from Washington street bridge, in the Chicago river, passed safely through the Washington, Madison, and Adams street bridges. At the Adams street bridge the captain signaled for the bridge at Jackson street, and when about 150 feet north of Jackson street signaled for the opening of the Metropolitan Railway bridge. It was at night, and the red lights on the Metropolitan bridge were showing. The Jackson street bridge opened, pursuant to the signal; but, through some defect in the machinery, the railroad bridge could not be operated. It appeared from the evidence that the master of the vessel could not see the red lights on the Metropolitan bridge until after he had passed through the draw of the Jackson street bridge, and at that time he could not check his vessel, so as to prevent a collision with the railroad bridge. The Court of Appeals held that the failure on the part of the railroad company to raise the bridge

promptly, when it had ample notice of the approach of the vessel, was an act of negligence, and that it was the duty of the railroad company, when its bridge tender found that the bridge would not open, to give some sort of a warning signal "that would timely notify the vessel of the difficulty and of the danger that was imminent, of which she could not otherwise be informed."

Libelant also relies upon City of Chicago v. Mullen, 116 Fed. 292, 54 C. C. A. 94, which holds that the city, by the ordinance already quoted, has designated a means by which those in charge of vessels plying the river shall know whether the bridge is or is not opened for passage, and that masters of vessels are entitled to rely upon a proper display of the signals provided for in the ordinance. In that case, however, the bridge, which was operated by electricity, was opened to let the vessel go through; but it failed to stop at the center protection, and the fact that it was operated by a bridge tender who knew nothing about electrical machinery was held to constitute the negligence which caused the accident. The vessel was invited to proceed through the draw, because the bridge opened in response to its signal.

The city, in this case, had complied with the requirements of the Lighthouse Board. By its ordinances it had prescribed some further regulations with reference to the signals on the bridges. If the city had operated the signals prescribed by the ordinances so as to mislead the captain of the vessel, I would be inclined to hold that by passing an ordinance broader than the federal requirement it would be obliged to live up to it. In this case, however, the master of the vessel was not misled. He knew when he went through the draw at Polk street that the Taylor street bridge was down. At that time he was 800 feet away. There was no time when he had any right to believe that the bridge was going to open, and it was his duty to keep his boat under such control that it would not come into collision with the bridge. The bridge tender gave no signal to proceed—gave no indication that the bridge was going to open. No bell was rung indicating to the traffic on the highway that the bridge was about to open. The only signal apparent to the master of the Markham was the red light provided by the government regulations, which is, in effect at least, a danger signal, and that signal he was bound to observe. It is a matter of common knowledge that a red light used in traffic or transportation means an obstruction or a danger of some sort to the passers-by.

The libelant claims that the vessel was "in extremis." Very likely it was, but placed there by its master. The danger was apparent, and it was the duty of the master to have avoided it, if possible, and the evidence shows clearly that, had the master not taken it for granted that the bridge would open, pursuant to his signal, he could have stopped the boat in time to have avoided the accident.

A single authority, it seems to me, is sufficient to illustrate the rule which is controlling in this case. In Kelley Island Co. v. City of Cleveland (D. C.) 144 Fed. 207, it appears that a contractor employed by the city had removed the protection piling from in front of certain submerged beams around a bridge. Neither the contractor nor the city had furnished to navigators any warning that the protection had

been removed. At the same time, it was well known to the captain of the steamer which was damaged. The court said:

"The removal of these protection piles may have been a concurring cause of the injury, but the accident did not occur because there was no warning there to inform navigators of the river how close they might approach the pier with safety. The Ohio did not strike the hidden beams because her master thought it was safe to go there; but she went there in spite of the master and wheelsman, and when, according to their testimony, they were endeavoring to keep farther out in the channel and away from the pier. The captain of the Lutz testifies that he was trying to keep out as near the middle of the channel as he possibly could; that he knew the protection piling had been taken out, and he told the pilot, as they were going upstream, to keep away from the center pier as far as possible, as 'she had her protection removed.' The wheelsman gives the same account of it. Now the libelant has strenuously endeavored to hold the city liable for this accident, and we may assume that this testimony is true, since such bearing as it has is against the contention of the city's liability. It follows, therefore, from all the testimony in the case, that the accident would have happened, even if the city, or the city's contractor, had maintained some warning signal indicating the point beyond which it was dangerous to go. If that be true, the city could not be at fault in relation to this accident, if, in the work of removing the pier, it removed the protection piles. To say that because, in the progress of the work of repair or reconstruction, it had removed the piles set up to protect vessels and protect the bridge, it could be held liable for a collision between a passing vessel and a portion of the pier, when the collision did not occur in consequence of the failure to warn navigators of the location of the pier, is to say, in effect, that the city did not have the right to remove the protection piles at all, if, in the course of the reconstruction of the bridge, it seemed to become necessary to do so. I therefore hold that the city is not liable."

It is true the Circuit Court of Appeals for this Circuit, in Clement v. Metropolitan West Side El. Ry. Co., supra, said:

"A bridge spanning a navigable river is an obstruction to navigation, tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary; the right of navigation being paramount. It is incumbent upon the owner that the bridge be so constructed that it may readily be opened to admit the passage of craft, and maintained in suitable condition thereto. It is also his duty to place in charge those who are competent to operate the bridge to watch for signals, and to open the bridge for the passage of vessels, and for the performance of such delegated duty he is responsible. It is also his duty to equip the bridge with proper lights giving warning of the position of the bridge and of its opening and closing. If for any reason the bridge cannot be opened, proper signals should be given to that effect, such as will warn the approaching vessel in time to heave to. A vessel, having given proper signal to open the bridge, and prudently proceeding under slow speed, has, in the absence of proper warning, the right to assume that the bridge will be timely opened for passage. She is not bound to heave to until the bridge has been swung or raised and locked, and to critically examine the situation before proceeding, but may carefully proceed at slow speed upon the assumption that the bridge will open in response to the signal, and may so proceed until such time as it appears by proper warning, or in reasonable view of the situation, that the bridge will not be opened, when it becomes the duty of the vessel, if possible, to stop, and, if necessary, to go astern."

This ruling does not, it seems to me, in any way relieve the master of the Markham from his obligation to exercise common sense when confronted with a situation that was perfectly apparent. The only signal exhibited from the bridge was a danger signal, indicating that

the bridge was not open. He had a perfect right to proceed at a slow speed upon the assumption that the bridge would open in response to his signal; but he had no right to proceed at such a speed, having due regard for the current and the distance between him and the bridge, that he could not stop and back his boat in time to avoid the accident. As well might it be said that a vessel approaching the Chicago avenue crib in a fog, whose captain saw the obstruction in ample time to stop or change his course, could proceed and damage his boat by collision with the crib, and then claim damages from the city because it had not given proper signal by way of whistle or bell.

The position which I have taken seems to be borne out fully in the two cases of Smith v. City of Shakopee, decided by the Court of Appeals in the Eighth Circuit; the first trial being reported in 97 Fed. 974, 38 C. C. A. 617, and the second in 103 Fed. 240, 44 C. C. A. 1.

The accident in this case was due entirely to the fault of the master of the Markham, and the libel is dismissed, at libelant's costs.